OPINION

OF THE JUSTICES OF THE SUPREME JUDICIAL COURT
GIVEN UNDER THE PROVISIONS OF SECTION 3
OF ARTICLE VI OF THE CONSTITUTION
*   *   *   *   *   *

QUESTIONS PROPOUNDED BY THE
GOVERNOR AND THE EXECUTIVE COUNCIL
ON NOVEMBER 27, 1956
ANSWERED DECEMBER 11, 1956

LETTER PROPOUNDING QUESTIONS
STATE OF MAINE
OFFICE OF THE GOVERNOR
AUGUSTA

November 27, 1956

To the Honorable Justices of the Supreme Judicial Court:

In connection with the examination by the Governor and Council of the ballots cast for County Attorney of Kennebec

County in the general election held September 10, 1956, questions have arisen as to the validity of certain absent voting and physical incapacity voting ballots. These ballots have been challenged on the ground that the envelopes and applications pertaining thereto were not returned to the Secretary of State in the containers which contained the ballots from the voting precincts in which the same were cast; in some instances these applications and envelopes were destroyed or missing; in those instances where the applications and envelopes have been returned to the Secretary of State following arrival of the official ballots, they have not been in sealed packages and have not been in sealed boxes.

No fraud is charged in the conduct of the election and none of the disputed ballots was challenged at the ballot box.

With respect, therefore, to these ballots, and the right of the Governor and the Executive Council to accept or reject disputed ballots, important questions of law having arisen, and believing the occasion to be a solemn one within the meaning of the Constitution, the Governor and the Executive Council respectfully request the Honorable Justices of the Supreme Judicial Court to advise them thereon.

## QUESTIONS

(1) Should absentee ballots be counted in voting precincts in which the absentee applications and envelopes were not in the box delivered to the Secretary of State containing the ballots cast in such precinct?

(2) Should absentee ballots be counted in voting precincts in which the absentee applications were not in the box delivered to the Secretary of State containing the ballots cast in such precincts?

(3)   Should absentee ballots be counted in voting pre-cincts in which the absentee envelopes were not in the box delivered to the Secretary of State containing the ballots cast in such precincts?

(4)   Should absentee ballots be counted in voting pre-cincts in which the absentee applications and envelopes were not in the box delivered to the Secretary of State containing the ballots cast in such precincts, but were subsequently transmitted to the Secretary of State, not in sealed packages and not in a sealed box, and were available for inspection at the time of the tabulation?

(5)   Should absentee ballots be counted in voting pre-cincts in which the absentee applications were not in the box delivered to the Secretary of State containing the ballots cast in such precincts, but were subsequently transmitted to the Secretary of State, not in sealed packages and not in a sealed box, and were available for inspection at the time of the tabulation?

(6)   Should absentee ballots be counted in voting pre-cincts in which the absentee envelopes were not in the box delivered to the Secretary of State containing ballots cast in such precincts, but were subsequently transmitted to the Secretary of State, not in sealed packages and not in a sealed box, and were available for inspection at the time of the tabulation?

(7)   Would the answers to questions (1), (2) and (3) be the same where the applications and envelopes were not enclosed with the ballots and were destroyed or missing?

(8)   Should absentee ballots be counted in voting pre-cincts in which the certificate required to be executed upon the application by officials charged by law with the regis-

tration and enrollment of voters, pursuant to R. S., c. 6, Sec. 7, is executed by only one such official?

Respectfully submitted,

s/ EDMUND S. MUSKIE
*Governor of Maine*

s/ SIDNEY R. BATCHELDER
*Chairman*

s/ LEON M. SANBORN
s/ W. HAYNES
s/ ARTHUR E. ELA
s/ DAVID A. NICHOLS
s/ ROSWELL P. BATES, D.O.
s/ CARROLL B. PEACOCK
*Members of the
Executive Council*

To the Honorable Edmund S. Muskie, Governor of Maine, and the Executive Council:

We, the undersigned, Justices of the Supreme Judicial Court, have the honor to submit the following answers to the questions propounded on November 27, 1956 relative to the election of a county attorney in the County of Kennebec:

QUESTION (1):

Should absentee ballots be counted in voting precincts in which the absentee applications and envelopes were not in the box delivered to the Secretary of State containing the ballots cast in such precinct?

ANSWER:

We answer in the affirmative.

QUESTION (2):

Should absentee ballots be counted in voting precincts in which the absentee applications were not in the box delivered to the Secretary of State containing the ballots cast in such precincts?

ANSWER:

We answer in the affirmative.

QUESTION (3):

Should absentee ballots be counted in voting precincts in which the absentee envelopes were not in the box delivered to the Secretary of State containing the ballots cast in such precincts?

ANSWER:

We answer in the affirmative.

QUESTION (4):

Should absentee ballots be counted in voting precincts in which the absentee applications and envelopes were not in the box delivered to the Secretary of State containing the ballots cast in such precincts, but were subsequently transmitted to the Secretary of State, not in sealed packages and not in a sealed box, and were available for inspection at the time of the tabulation?

ANSWER:

We answer in the affirmative.

QUESTION (5):

Should absentee ballots be counted in voting precincts in which the absentee applications were not in the box de-

livered to the Secretary of State containing the ballots cast in such precincts, but were subsequently transmitted to the Secretary of State, not in sealed packages and not in a sealed box, and were available for inspection at the time of the tabulation?

ANSWER:

We answer in the affirmative.

QUESTION (6):

Should absentee ballots be counted in voting precincts in which the absentee envelopes were not in the box delivered to the Secretary of State containing ballots cast in such precincts, but were subsequently transmitted to the Secretary of State, not in sealed packages and not in a sealed box, and were available for inspection at the time of the tabulation?

ANSWER:

We answer in the affirmative.

QUESTION (7):

Would the answers to questions (1), (2) and (3) be the same where the applications and envelopes were not enclosed with the ballots and were destroyed or missing?

ANSWER:

We answer in the affirmative.

QUESTION (8):

Should absentee ballots be counted in voting precincts in which the certificate required to be executed upon the application by officials charged by law with the registration and enrollment of voters, pursuant to R. S., c. 6, Sec. 7, is executed by only one such official?

ANSWER:

We answer in the affirmative.

In your communication we note that "no fraud is charged in the conduct of the election and none of the disputed ballots was challenged at the ballot box." The issue is raised, therefore, whether the failure of the election officials to carry out their duties strictly in accordance with the "Absent Voting. Physical Incapacity Voting" statute shall invalidate ballots in the stated categories. R. S., c. 6 (1954).

We conclude that the provisions of the statute touching the procedure to be employed at the polls and the disposition of applications and envelopes following an election are directory and not mandatory in nature. In other words, violation of the statute by election officials in the situations here under consideration, at least in the absence of fraud, is not a sufficient ground for invalidating ballots.

We distinguish between acts of the voter and acts of the election officials. The voter must comply with the statute insofar as his acts are concerned. Failure, for example, of the voter to take the prescribed oath invalidates his vote. *Miller* v. *Hutchinson,* 150 Me. 279.

In the cases presented there has been no failure whatsoever of the voter to do his part. The errors complained of in each instance came from action or failure to act by election officials after the casting of the ballots (questions 1 to 7 inclusive), or before the casting of the ballots (question 8). There is, however, no difference in principle between the two situations. In both cases, the errors occurred after the voter had placed his ballot beyond his possession and control and in the possession and control of public officials charged with solemn duties and obligations in the conduct of elections.

There is not the slightest suggestion in your communication, or in the questions, that the ballots themselves are other than in proper form. Plainly, apart from the errors complained of, they would be counted for one candidate or the other. The intention of the voter was clearly expressed. Further, and this is a fact of importance, the ballots in dispute were not challenged at the polls. By a timely challenge the particular ballot with supporting papers would have been suitably marked and made available for examination and decision. R. S., c. 6, Sec. 12. Such was the case in *Miller* v. *Hutchinson, supra.*

The governing rules have been well stated by Chief Justice Rugg of the Supreme Judicial Court of Massachusetts in *Swift* v. *Registrars of Voters of Quincy,* 281 Mass. 271, 183 N. E. 730, at p. 735:

> "This failure on the part of election officers to perform the precise duty imposed on them with respect to the envelopes does not invalidate the votes or afford any ground for nullifying the count."

and again in *Swift* v. *Registrars of Voters of Milton,* 281 Mass. 264, 183 N. E. 727, 728, 729:

> "The main purpose of the election statutes is to provide a convenient method for the voter qualified according to law to express in secret his preference for persons to be elected to the several offices to be filled and on the questions to be answered at an election and to have that expression of preference counted fairly and honestly, all in conformity to reasonable regulations. The statutes of this commonwealth contain in great detail requirements as to the preparation and distribution of ballots, the marking and deposit of them in ballot boxes, the counting of those ballots and the making of official returns of the results of the voting. . . . 'As stated by Andrews, C. J., in People v. Wood, 148 N.Y. 142, 147, 42 N.E. 536, 537: 'The object of elections is to ascertain the popular will, and not to thwart it. The object of election laws is to secure

the rights of duly qualified voters, and not to defeat them.' This must be borne in mind in the construction of such statutes, and the presumption is that they are enacted to prevent fraud and to secure freedom of choice, and not, by technical obstructions, to make the right of voting insecure.' Blackmer v. Hildreth, 181 Mass. 29, 31, 63 N.E. 14, 15; . ."

\* \* \* \* \* \* \* \* \* \*

"The design of the recount is to verify, not to destroy, the result of an election as previously declared by the election officers. Where without culpability verification has become impossible as to any part of an election that part of the election does not become a nullity."

Respectfully submitted:

ROBERT B. WILLIAMSON
DONALD W. WEBBER
WALTER M. TAPLEY, JR.
FRANCIS W. SULLIVAN

Dated at Augusta, Maine, this 11th day of December, 1956.

To His Excellency, Governor Edmund S. Muskie,
and the Honorable Executive Council:

The undersigned Justices of the Supreme Judicial Court have the honor to submit the following answers to the questions propounded to the several members of this Court bearing date of November 27, 1956, in connection with the examination of the ballots cast for County Attorney of Kennebec County in the general election held September 10, 1956, questions having arisen as to the validity of certain absent voting and physical incapacity voting ballots.

Being unable to subscribe to the answers submitted by our associates, and because of the gravity and importance we attribute to the issues presented by your questions, we

consider it advisable to submit our views upon the questions in a separate reply, together with the reasons, at some length, for our conclusions.

The questions propounded to us are as follows:

(1) Should absentee ballots be counted in voting precincts in which the absentee applications and envelopes were not in the box delivered to the Secretary of State containing the ballots cast in such precinct?

(2) Should absentee ballots be counted in voting precincts in which the absentee applications were not in the box delivered to the Secretary of State containing the ballots cast in such precinct?

(3) Should absentee ballots be counted in voting precincts in which the absentee envelopes were not in the box delivered to the Secretary of State containing the ballots cast in such precincts?

(4) Should absentee ballots be counted in voting precincts in which the absentee applications and envelopes were not in the box delivered to the Secretary of State containing the ballots cast in such precincts, but were subsequently transmitted to the Secretary of State, not in sealed packages and not in a sealed box, and were available for inspection at the time of the tabulation?

(5) Should absentee ballots be counted in voting precincts in which the absentee applications were not in the box delivered to the Secretary of State containing the ballots cast in such precincts, but were subsequently transmitted to the Secretary of State, not in sealed packages and not in a sealed box, and were available for inspection at the time of the tabulation?

(6) Should absentee ballots be counted in voting precincts in which the absentee envelopes were not in the box delivered to the Secretary of State containing ballots cast

in such precincts, but were subsequently transmitted to the Secretary of State, not in sealed packages and not in a sealed box, and were available for inspection at the time of the tabulation?

(7) Would the answers to questions (1), (2) and (3) be the same where the applications and envelopes were not enclosed with the ballots and were destroyed or missing?

(8) Should absentee ballots be counted in voting precincts in which the certificate required to be exceuted upon the application by officials charged by law with the registration and enrollment of voters, pursuant to R. S., c. 6, § 7, is executed by only one such official?

At the outset, we express our opinion that in view of the statutes, to which we will refer later, the application for an absent voting ballot or for a physical incapacity voting ballot, together with the envelope to which said application is attached, upon which envelope is printed the jurat of the voter, is an integral part of the absent voting ballot itself. Without the envelope and the attached application, there is no ballot.

We answer all questions except the seventh question in the negative. We answer the seventh question in the affirmative.

The laws relating to absent and physical incapacity voting are now embodied in Chapter 6, Revised Statutes, 1954. The law originally establishing the right of absent voting was enacted in 1921, under the provisions of Chapter 38, Public Laws, 1921. Subsequently, in 1937, the act was amended providing for absent voting on the part of persons physically incapacitated. This amendment was enacted under the provisions of Chapter 183, Public Laws of 1937.

The pertinent section of the statute now applicable to issues presented by your questions, is found in Section 11 of Chapter 6, R. S. 1954, and reads as follows:

> "All envelopes, opened or unopened, shall be retained with the ballots cast at the election, and preserved and destroyed in the manner provided by law for the retention or preservation and destruction of official ballots."

This sentence has been preserved intact since the original enactment of the absent voting law in 1921.

We should bear in mind, that the right of voting by absent voting ballot or physical incapacity ballot, is a special privilege. As was said by the Supreme Judicial Court of the State of Maine in the case of *Miller* v. *Hutchinson*, 150 Me. 279, 110 A. (2nd) 577:

> "The absentee voting law gives the voter a right that did not exist before its enactment and, if perchance, this law is repealed no voter could claim the right to vote in absentia as a matter of right."

In the *Miller-Hutchinson* case, the Court rejected all absent voting ballots cast in the particular election then in issue, because of an inadequate jurat on the envelopes containing the absent voting ballots and the Court said:

> "The Legislature well knew this method of voting is open to abuse and fraud."

Because the Legislature in 1921 could well foresee that this method of voting was open to abuse and fraud, it enacted into law the very wise provision, previously referred to, to the effect that all envelopes shall be retained with the ballots cast at the election and preserved and destroyed in the manner provided by law for the retention, preservation and destruction of official ballots.

We feel that it probably would be of value for us to briefly set forth some of the provisions of the law relating to elections in general, and particularly to the provisions of the statutes relating to absent voting and physical disability voting.

Section 39, Chapter 5, R. S. 1954, sets forth the procedure as to how ballots shall be preserved. The pertinent portions of this section read as follows:

"When the ballots have been sorted and counted and the result declared and recorded, each lot of ballots together with a signed statement of the count of that lot thereof shall in open meeting be sealed in a package by the election official, or officials who counted the same. The packages so sealed shall be placed in the container in which the ballot had been delivered at the voting place together with all unused ballots and the container shall be sealed before removal from the voting place to the office of the city, town or plantation clerk. The check lists which have been used at such voting place shall likewise be sealed and forthwith returned to the city, town or plantation clerk. In case two or more kinds of official ballots are used in any election, each kind shall be sealed in a separate package. All such ballots, check lists and signed statements of officials shall be so sealed that the packages and check lists cannot be opened or examined without first breaking the seal; and the sealed packages of ballots cast at any state election or at any election of presidential electors shall have an endorsement of substantially the following tenor indorsed thereon or securely affixed thereto:

'This package contains the ballots cast at an election for        held in the        of        (or in ward        of the city of        ) on the        day of        19   ; said ballots were sorted, counted, result declared and recorded, and this package sealed in open meeting in accordance with section 39 of chapter 5 of the revised statutes.'

Such indorsement shall be signed by the ward, town or plantation clerk and by the wardens in cities or voting precincts, or by a majority of the selectmen of towns and of the assessors of plantations. The ballots, check lists and signed state-

ments of officials returned to the city clerk after any city election and all other ballots returned to him shall be preserved by him as a public record for 6 months. The provisions of this section shall apply to all elections, including primary elections and elections for determining initiated and referendum questions."

At this point it should be noted that the foregoing provision of Section 39, Chapter 5, is the one which ties in with the provisions of Section 11 of Chapter 6, which provides that all envelopes, bearing the jurat of an absent or physical disability voter, to which must be attached the application for such ballot, shall be preserved in the same manner provided by Section 39, Chapter 5, R. S., 1954, for the retention, preservation and destruction of official ballots.

It is the failure of various clerks to comply with this very simple procedure, which has led to the propounding of the questions we are now called upon to answer.

Now, let us take a look at the statutes which set forth the procedure to be followed by a person who desires to vote with an absent voting ballot or a physical incapacity ballot, and the duties required of the election officials including the city, town and plantation clerks.

Section 2, Chapter 6, R. S., 1954, sets forth in detail the forms to be used for the applications, the certificate of the registration officials, the certificate to be signed by the physician in the case of physical incapacity applications, and the form of the jurat on the envelope which is to contain the voted ballots.

If a person desires to vote with an absent voting ballot or a physical incapacity ballot he secures an application. This application has to be signed by the voter. At the bottom of the form is a certificate to be signed by a majority of the officials having charge of the registration of voters. On an

application for a physical incapacity ballot there is a certificate to be signed by a physician duly admitted to practice.

When the application has been signed by the voter, and in the case of physical incapacity ballot, when the application has been certified by a physician duly admitted to practice, a ballot is delivered or mailed to the voter.

Sections 6 and 7, Chapter 6, R. S., 1954, provide that before the closing of the polls on election day, the clerk shall deliver to the officials charged by law with the registration and enrollment of voters in the city, town or plantation all applications for absent voting and physical incapacity voting ballots, which have been received by him. If these officials are satisfied, after examination of the application, that the signature is genuine, and the statements made by the applicant are true, they shall execute the certificate thereon and return it to the clerk. Note that the certificate must be certified by a majority of the officials.

Section 8, Chapter 6, R. S., 1954, provides for the procedure to be followed by the voter. The ballot must be marked, that is voted, in the presence of an official authorized by law to administer oaths. If the marking is done within the state, a justice of the peace will suffice. If the marking is done outside of the state, the official must be a notary public, who has a seal, which seal must be affixed. There is also provision for voting on the part of persons in the Armed Forces of the United States. No other person may be present at the time of the marking of the ballot except the voter and the official authorized by law to administer oaths. Before marking the ballot, the voter must exhibit it to the official, who shall satisfy himself that it is unmarked. The voter shall not allow the official to see how he marks it. Having marked, that is, voted the ballot, the voter shall enclose the ballot in the envelope provided, and seal it. The jurat is then completed and signed by the voter, and signed by the official. The jurat contains the reasons

why the voter is voting with an absent voting or physical incapacity ballot.

The ballot having been voted and properly sealed in the envelope provided, it is then delivered to the clerk of the city, town or plantation.

Section 10, Chapter 6, R. S., 1954, provides that:

"Upon receipt of an envelope purporting to contain an official absent voting ballot or physical incapacity voting ballot, the city clerk shall attach thereto the corresponding application and shall keep a list of names and addresses, arranged by voting precincts of all voters whose names appear thereon, together with the date when such envelopes were received, and these lists shall be public records and shall be preserved by the clerk until the time fixed by law for the destruction of ballots cast in the coming election. All such envelopes shall be preserved unopened. Upon election day before the hour for closing the polls, the clerk shall deliver all such envelopes received by him to the election officials in the several voting precincts in which the voter named therein assert the right to vote, together with a list signed by him of the voters' names and addresses as shown thereon."

The procedure in towns and plantations is practically the same, except that there is no provision in the case of towns and plantations for the lists provided for in the case of cities.

Section 11, Chapter 6, R. S., 1954, outlines the procedure to be employed by the election officials at the polls in respect to absent voting ballots and physical incapacity ballots. The first part of this section provides in substance, that immediately after the closing of the polls, and after the regular ballots cast have been removed from the ballot box, the presiding officer shall open all envelopes delivered to him and shall compare the signatures on the envelopes therein

enclosed with the signatures on the applications attached thereto, and shall examine the affidavits. If the affidavits are properly executed and the signatures on the affidavits compare with the signatures on the applications, the ballots are deposited in the ballot box. Of course, if it does not appear that the affidavit is properly executed, or if it appears that the signatures do not agree, the ballot will be rejected. It is provided that the envelope shall be opened in such a manner as not to destroy the affidavit thereon.

As previously stated, the statute then provides that all the envelopes shall be retained with the ballots cast at the election and preserved and destroyed in the manner provided by law for the retention, preservation and destruction of official ballots. While there is no mention in this sentence of the applications, as Section 10 provides that the application must be attached to the envelope, it follows that the application continues to be attached to the envelope and is to be preserved along with the envelope, in conformity with the manner in which other official ballots are preserved.

The requirement of the statute, that the envelope and application be preserved is such a simple requirement, that there is no valid excuse for non-compliance, and non-compliance may well be an incident sufficient to arouse suspicion.

The undoubted purpose of the provisions of the statute that the envelopes and applications be retained and preserved is to protect the purity of the ballot and to guard against abuse and fraud.

If affirmative answers to your questions are predicated on lack of an allegation of fraud, our answer is, that fraud is not likely to be discovered, in the absence of the envelopes and the applications. In our opinion no strength is added to the position of a contestant to elective office by merely adding a general allegation of fraud, which perhaps he may

not be able to prove until he has had an opportunity to examine the ballots, the envelopes and the applications.

No doubt when the Legislature enacted this very wise provision of the law, there was envisioned the many abuses to which absent voting procedure is susceptible. Among these abuses may we suggest the following:

1.  Applications for absent voting ballots may be approved in blank by the registration officials, in advance of the signature of the prospective voter.

2.  An application may be approved by only one member of the board of registration, in spite of the fact, that the statute definitely provides that the approval must be by a majority. Incidentally, this is an added reason for our negative answer to question number eight.

3.  Partisan political workers may secure absent voting ballots or physical disability ballots and have the ballots voted without the presence of an official authorized to take an oath, and some notary public or justice of the peace may sign the jurat without ever having seen the voter.

4.  A physically incapacitated voter may be voted without a certificate from an attending physician.

5.  The person who purports to sign as a physician, may not be a physician at all.

6.  Applications and absent voting ballots may be procured and fraudulently voted in the names of persons who are out of town election day, and who have not applied for an absent voting ballot. In such cases there would be no way for the election officials to discover the fraud before the ballot was cast.

7.  Persons may be allowed to vote, who are not, in fact, legally qualified to do so. If this be the fact, it cannot be discovered without an opportunity to see the envelopes and the applications.

8. There may be no signature on the application.

9. There may be no signature on the jurat.

10. The application may not be in proper form.

11. There may not be listed a valid reason in the jurat for voting by absent voting ballot.

12. The person purporting to administer the oath may not be an authorized official.

These are only some of the abuses and frauds which could exist, some, perhaps due only to negligence, without bad faith, and others due to evil machinations, but in either event nullifying the ballot.

That the election officials presiding at the polls allowed all of these ballots to be cast carries no presumption of regularity. The presumption of irregularity is just as consonant.

We repeat that if any fraud exists, it cannot be discovered without an opportunity, in the event of a contest, to see and examine the envelopes and the applications.

It is our opinion that the right, provided by statute, to challenge absent voting ballots and physical incapacity ballots before they are cast, is not an adequate protection against the evils to which the absent voting law is subject.

We are aware there is a statute which makes it a criminal offense for an election official to negligently fail to perform his duties, but during the thirty-five years that this law has been in existence, there has not come to our attention or knowledge any prosecution for such offense.

No one is more reluctant that we are, to disfranchise an honest voter, who through no fault of his own, now finds that the legality of his ballot is being questioned.

It is well known that in many close elections, the result may be determined by the absent voting ballots, the pro-

curement of which is limited only by the aggressiveness and ingenuity of political workers. In this case, approximately 500 absent voting ballots are in question. Approximately 29,000 other ballots were voted in person. The rights of approximately two percent, who voted by absent voting ballot are not paramount to the rights of the approximately ninety-eight percent, who appeared at the polls in person. These ninety-eight percent have every reason to expect that they will be protected from the abuses and frauds inherent in the absent voting procedure.

At this point, we digress to discuss briefly questions 4, 5, and 6, which relate to a situation where the envelopes and the applications were returned at a date subsequent to the return of the other ballots, in unsealed packages and unsealed boxes. The law definitely provides that such applications and envelopes should be placed in the container with the ballots, and sealed in such a manner that they cannot be examined without first breaking the seal. To accept the applications and envelopes in unsealed packages, is to condone the possibility of correction of existing errors, such as, absence of signature on the application, absence of signature on the jurat, improper jurat, supplying physician's certificate, and the adding of another name of a registration official when only one has previously signed.

It has been said, and we recognize the doctrine, that in the determination of whether or not a ballot is to be rejected as invalid, a distinction is to be made in cases where the voter, himself, has done or performed some act for which he can be blamed, or where, being blameless himself, and having done everything he is supposed to do, his vote is placed in jeopardy, through the act of some election officials over which he has no control.

Should this argument be advanced against our opinion that the ballots described in your eight questions should be rejected, we respectfully call your attention to a prior de-

cision of the Supreme Judicial Court of this State as well as opinions rendered by Justices of this Court.

In the case of *Miller* v. *Hutchinson,* previously referred to, all of the absent voting ballots cast in a city election were rejected as void, because of a form of jurat which did not comply with the form prescribed by the statute. In this particular case, how can any culpability or blame be attached to the voter? He cast his absent voting ballot or his physical incapacity ballot, and completed what he supposed was a valid jurat on a form furnished by the city clerk. Yet, this Court ruled all of the ballots invalid.

Sections 61 and 62, Chapter 5, R. S. 1954, provide for the organization of plantations for the purpose of holding elections. According to the provisions of Section 61, certain acts must be performed by the plantation officials in preparation for holding an election. After the congressional election in the Third Congressional District of Maine in 1932, a contest ensued, and the contention was advanced that certain plantations in one of our counties had not complied with the law in organizing, in accordance with the provisions of what is now Section 61. In response to questions propounded by the Executive Council, the Justices of this Court, at that time, answered, that because of the failure of these plantations to organize, the entire vote should be rejected. Surely, the people who came to the polls on election day were not to blame for the fact, that the plantation officials had not properly organized the plantation.

Section 5, Chapter 5, R. S., 1954, provides how our official ballots shall be printed and stamped. Section 40, Chapter 5, R. S., 1954, definitely provides that no ballot except an official ballot shall be counted. Let us suppose that in some manner a city clerk, or the secretary of state, fails to provide proper official ballots for some voting precincts. Let us further suppose, that the voters go to the polls as they customarily do, and after being individually checked are

given these ballots, which do not comply with the law and, the ballots are voted with all due honesty and intent. This Court has ruled, that such ballots shall not be counted.

After the primary election of 1924, a contest developed over the nomination for Governor. It was discovered that in one town no voting booths had been provided, and the voters marked their ballots upon tables. The entire vote of the town was rejected as a result of an answer given to the Governor and Council, by the Justices of the Supreme Judicial Court. Were the voters to blame, when they arrived at the polling place to discover that there were no voting booths? Had they not done everything that they were supposed to do? Were not their votes rejected because of what other persons had done?

See 124 Me. 475, for the language of the Justices of this Court, used in throwing out the vote of this town which had not provided booths:

"If one municipality can do this with impunity, all can, and the Australian ballot law is virtually repealed, and the safeguards against bribery and fraud are swept away."

The Justices expressed the thought that it was a hardship upon the innocent voters who came to the polling places expecting that the officers had done their duty and erected the necessary booths. Nevertheless, the voters were disfranchised.

To paraphrase the Justices in the decision in 124 Me. 475, if one or more town clerks can disregard a definite provision of the statute, then all can.

In arriving at our conclusion, we have given consideration to the decision of the Supreme Judicial Court of Massachusetts in the case of *Swift* v. *Registrars of Voters of Quincy,* 281 Mass. 271, 183 N. E. 730. In this case there were two issues involved. A number of ballots were chal-

lenged because the ballots were not cancelled as required by law. The lack of cancellation was due to the breakdown of the mechanism of voting machines. The Court said, and we think rightly so, that the failure to cancel the ballots by imperfect machines would not impair the safeguard for the purity of the election established by the statute. Failure of the machine to cancel the ballots did not open the door to cheating or laxity of conduct.

Other ballots were challenged for the same reasons set forth in the contest now under your consideration. The Court, in considering a statute similar to ours, declined to reject the ballots.

In our judgment, this portion of the Massachusetts opinion is ill considered. It is not good law. We do not subscribe to it. We feel that a failure on the part of the election officials to comply with the positive requirement of the law opens the door to cheating and laxity of conduct and goes to the very heart of the purity of the ballot.

To rule that the ballots described in your questions should be counted, is to repeal in effect, the laws enacted to protect the purity of the ballot. It is to put the stamp of approval on failure to comply with the law. It is to give the green light to election officials in the future to disregard the provisions of the statute and to sweep away the safeguards against the abuse and fraud, to which this Court referred in *Miller* v. *Hutchinson*.

It is, therefore, our position, that the absent voting and physical incapacity ballots described in your questions, should not be counted.

Respectfully submitted,

ALBERT BELIVEAU
F. HAROLD DUBORD

Dated at Augusta, Maine, this 11th day of December, 1956.