WILLIAM H. HEBERT *vs.* STATE BALLOT LAW COMMISSION
& others.[1]

Suffolk. June 9, 1980. — July 14, 1980.

Present: HALE, C.J., GRANT, & DREBEN, JJ.

*Constitutional Law*, Initiative, Referendum. *Jurat.* *Elections*, Validity
of petition.

In an action under G. L. c. 30A, § 14, challenging a decision of the State
Ballot Law Commission that there were sufficient valid signatures on
an initiative petition, a finding that a jurattor had committed impro-
prieties on a number of petitions did not require the Commission to in-
validate the signatures on all the remaining petitions which contained
his jurat where there was no evidence that the jurattor had procured
forged signatures or had knowledge of fraud or fraudulent conduct by
the circulators of the petitions. [278-280]

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 31, 1980.

The case was heard by *Keady,* J., a District Court judge
sitting under statutory authority.

*Jeffrey M. Freedman (Louis C. Miller* with him) for the
plaintiff.

*Andrew J. Cetlin,* Assistant Attorney General, for the de-
fendants.

*William A. McDermott, Jr.,* for the interveners.

DREBEN, J. This is an appeal from a judgment affirming
a decision of the State Ballot Law Commission (Commis-
sion), that there were sufficient valid signatures on an initi-
ative petition for a law "limiting state and local taxation
and expenditures" (also known as Proposition 2 1/2), despite
objections filed by the plaintiff pursuant to G. L. c. 55B,

[1] The Secretary of the Commonwealth and the clerk of the House of
Representatives.

§ 5.[2]  The parties filed a statement of agreed facts, and the record of the proceedings before the Commission, including the transcript and exhibits, was admitted in evidence. We affirm.

The following facts are undisputed. The petition as filed contained 1,173 signatures in excess of the 55,868 minimum required.[3]  Hebert challenged the validity of 1,740 signatures, and the Commission invalidated only 441, so that the objections failed to disqualify the measure by a margin of 732 signatures (1,173 − 441 = 732).

The plaintiff's objections to 1,171 signatures relate to the jurats[4] of one Hyatt, who was an official of an organization entitled Citizens for Limited Taxation (C.L.T.), which was the moving force behind the initiative petition. A number of improprieties or irregularities appeared in connection with some sheets of the petition in which Hyatt was involved. He signed the name of his wife as "jurattor"[5] on one petition and the name of his father on another, and he executed jurats on twenty-one other petition sheets containing a total of 117 signatures which the Commission deter-

---

[2] General Laws c. 55B, § 5, inserted by St. 1977, c. 927, § 14, effective January 1, 1979, reads in pertinent part as follows: "Objections that signatures appearing on an initiative or referendum petition have been forged or placed thereon by fraud and that in consequence thereof the petition has not been signed by a sufficient number of qualified voters actually supporting such petition, as required by the constitution, or any other objection relating to signatures on such petitions, may be filed with the state secretary . . . ."

[3] Article 48, of the Amendments to the Massachusetts Constitution, The Initiative, V, § 1, as amended by art. 81, § 2, requires that such petitions be signed by "not less than such numbers of voters as will equal three per cent of the entire vote cast for governor at the preceding biennial state election."

[4] General Laws, c. 53, § 22B, as amended by St. 1961, § 344, provides in relevant part: "Each initiative . . . petition . . . shall contain a statement signed under the penalties of perjury by the person who circulated the petition, that each person whose name appears on said petition signed the same in person."

[5] As used herein, and by the Supreme Judicial Court in *Molesworth* v. *State Ballot Law Commn.*, 348 Mass. 23, 28 (1964), the term "jurattor" designates the person making the statement under the penalties of perjury which is required by G. L. c. 53, § 22B.

mined to be nongenuine. Hyatt's testimony before the Commission indicated that he had signed as "jurattor" on numerous sheets which he had not personally circulated, and he could not at the time of the hearing determine by looking at the sheets which person had circulated any particular sheet.

The plaintiff argues for invalidation of 1,171 signatures on two grounds. First, he claims that 455 signatures should have been invalidated because they appear on the same twenty-one sheets on which there are 117 invalid signatures and that those sheets are tainted in their entirety. Second, he claims that because of the improprieties committed by Hyatt on the twenty-one sheets, all the remaining sheets which Hyatt had circulated and which also contain his jurat, involving 716 signatures, are also "contaminated" and should have been rejected.

The Commission invalidated all the signatures on the sheets on which the jurats of Hyatt's father and wife appeared, and also all the nongenuine signatures on the twenty-one sheets. There were 455 genuine signatures on those sheets, and none of those signatures was invalidated. The Commission refused to invalidate the other 716 genuine signatures[6] on the sheets which Hyatt had circulated. (In its findings, the Commission stated that it used the "term 'non-genuine' rather than 'forged' . . . to emphasize that many of the signatures invalidated were apparently signed in good faith, often by a spouse or other close family member.") It also found that Hyatt, in executing the jurats on the twenty-one sheets of the petition which he did not circulate, "could have reasonably believed that the persons from whom he received the completed petition forms were trustworthy."

---

[6] The plaintiff's counsel, as to these 716 signatures, stated before the commission as follows: "[E]ither the experts have determined that they do not challenge any signatures as being non-genuine or they have simply not had a chance to look at some of them and therefore have no opinion, but as to that we are waiving whether they may or may not be forgeries." The statement of agreed facts sets forth that these pages contain 716 signatures "which do not contain any non-genuine signatures."

The trial judge's "findings" indicate that all counsel agreed that "there was no intent on the part of Mr. Hyatt or anyone from C.L.T. to defraud" and that "the circulators numbered in the thousands."

Hebert's action to review the Commission's decision purports to be brought under both G. L. c. 30A, § 14, and G. L. c. 56, § 59. As the Commission's decision was clearly reviewable under G. L. c. 30A, § 14 (compare *Molesworth v. State Ballot Law Commn.*, 348 Mass. 23, 24, 29 [1964]),[7] we need not decide whether G. L. c. 56, § 59, was also available.

The Commission properly refused to discard the genuine signatures of 716 voters on those sheets on which Hyatt appears as the "jurattor." Unlike the law in a few jurisdictions, e.g., *Tyler v. Secretary of State*, 229 Md. 397, 404 (1962), and *Nist v. Herseth*, 270 N.W.2d 565, 568 (S.D. 1978), Massachusetts does not require a circulator to be "an eyewitness to the affixing of every signature." *Molesworth v. State Ballot Law Commn.*, 348 Mass. at 28. He can satisfy the requirements of G. L. c. 53, § 22B, by relying "upon some trusted person." *Id.* The Commission's finding that Hyatt relied on persons he "reasonably believed to be trustworthy" is supported by substantial evidence. He testified that in almost all instances he knew where the petitions came from, and specifically stated, "If I trusted the individual who brought the sheet to me, I wouldn't have any problem about jurating it. I am not aware of any occasions where I jurated any multiple number of sheets or any sheets where I didn't have a very good idea of where it came from."

While we do not condone the improprieties and careless operations of C.L.T. and Hyatt, we do not believe the constitutional right to initiate petitions or the purposes of c. 53, § 22B, would be served by adopting Hebert's contamination theory in the circumstances of this case. See art. 48, Gen-

---

[7] We note that there was evidence before the Commission as to all the matters in the agreed statement of facts filed in the Superior Court.

eral Provisions, VII, of the Amendments to the Massachusetts Constitution. Nor do the authorities cited by Hebert support such contamination. There are no procured forged signatures, or other evidence of knowledge of fraud or fraudulent conduct by the circulators of the sheets of the petition. See, e.g., *Sturdy* v. *Hall*, 201 Ark, 38, 44-45 (1940); *Jensen* v. *Wells*, 66 S.D. 269, 273-274 (1938). There is no evidence of massive fraud or other irregularities. See, e.g., *Proskin* v. *May*, 40 N.Y.2d 829 (1976). As pointed out in *State* v. *Olcott*, 62 Or. 277, 286 (1912), "[I]n the absence of evidence of intentional fraud or guilty knowledge on the part of the circulator, it would be an unjust rule to deprive the honest signer of his right to have his signature counted, merely because some disqualified person signed, or because some person, without the knowledge of the circulator, affixed a fictitious name, or gave a fictitious address."

Nor does *United Labor Comm.* v. *Kirkpatrick*, 572 S.W.2d 449 (Mo. 1978), on which Hebert relies, support his position. All the court indicated in that case was that where irregularities occurred in affidavits or notarial attestations, the petition no longer had prima facie validity and further examination was required. Although the court used language of "shifting the burden" to the proponents of the signatures to show their underlying validity, no more proof of validity was required in that case than was presented here. The petitions were upheld after the validity of the signatures was shown through voter registration list checks and testimony of circulators. Moreover, in that case, unlike here, the statutory affidavits and notarial certificates were executed in express violation of statutory provisions. The language of the court indicates that the "burden" it placed on the proponents was not great. "[W]e should look to the purpose of that affidavit and of that verification. The rationale behind initiative amendments is that a sufficient number of registered voters deem an issue important enough that the issue should be put to a vote before the people. The assertation [*sic*] of this constitutional right by the required number of legal voters should not be lightly cast

aside." *Id.* at 453. The purpose of the jurat is to provide a check on the signatures. "If the validity of the voters' signatures can be otherwise verified, their signatures should not be invalidated." *Id.* at 454.

Since we have upheld the Commission as to the validity of the 716 signatures, we need not consider the remaining objections of Hebert, because even if we were to invalidate all the other signatures challenged by him (including the 455 signatures on the twenty-one sheets), he would still not overcome the margin of valid signatures.

*Judgment affirmed.*