THOMAS G. MORWAY, SR., & others[1] vs. TOWN OF
WEBSTER & others.[2]

No. 89-P-883.

Worcester. September 14, 1990. - December 14, 1990.

Present: PERRETTA, KASS, & GILLERMAN, JJ.

*Elections*, Validity of petition. *Agency*, Scope of authority or employment.
*Estoppel. Municipal Corporations*, Charter, Selectmen. *Referendum.
Constitutional Law*, Referendum. *Words*, "Shall."

There was no merit to contentions by persons seeking to file a referendum
petition with a town's board of registrars that delivery to the registrars
was timely made because the chairman of the board of selectmen was
acting for the board of registrars when he accepted the petition and
stated that "he would send it over to the board of registrars," or that
the town should be estopped from challenging the timeliness of the fil-
ing because of the conduct of the chairman of the board of selectmen.
[608]

The mere fact that persons seeking to file a referendum petition containing
more than one thousand signatures with a town's board of registrars
filed the petition on the seventh day of the prescribed seven-day period
after dissolution of the town meeting but deviated from the procedure
established by the town's charter by delivering the petition to the chair-
man of the board of selectmen and not to the clerk of the board of
registrars did not invalidate the petition where, on the special facts of
this case, no useful purpose intended by the charter would have been
frustrated by the clerk's acceptance of the proffer of the petition by the
selectmen on the morning of the eighth day when the town clerk (who
is also clerk of the board of registrars) was notified that a referendum
petition was at the selectmen's office; consequently, since the parties
had agreed that all the signatures on the petiton were valid, a special
election for submission of the question set forth in the referendum peti-
tion to the voters was to be ordered by the board of selectmen. [608-
612]

---

[1]Individually and as members of "Stop Incineration Now — Conserve
Environmental Resources Efficiently."

[2]The board of selectmen and the board of registrars of the town of
Webster.

CIVIL ACTION commenced in the Superior Court Department on January 22, 1988.

Motions for summary judgment were heard by *James P. Donohue*, J.

*Michael R. Makynen* for the plaintiffs.

*Stanley L. Weinberg* for the defendants.

GILLERMAN, J. Fifteen members of SIN-CERE ("Stop Incineration Now — Conserve Environmental Resources Efficiently") filed an action in the Superior Court against the town of Webster (the town), its board of selectmen and board of registrars after the clerk of the board of registrars refused to accept the plaintiffs' referendum petition. The defendants claimed that the petition had not been filed in a timely fashion, and their motion for summary judgment was allowed.

The town employs a form of representative town meeting government established under St. 1933, c. 13, as authorized by G. L. c. 43A, § 1. The town's charter[3] contains a broad referendum provision which permits a challenge to any final vote of the town meeting with certain limited exceptions not applicable here.[4] Section 2-15 of the charter provides that no final vote of a town meeting (other than a vote on an excepted subject) shall become operative until the expiration of

---

[3]The town's current town charter was approved and adopted by the voters of the town pursuant to the procedures provided by the Home Rule Amendment (art. 2 of the Amendments to the Constitution of Massachusetts, as appearing in art. 89 of those Amendments). See also G. L. c. 43B, §§ 1-20.

[4]The exceptions appear in § 2-15(a) which provides:

"*Effective Date of Final Votes* - No final vote of the town meeting under any article appearing in the warrant for such meeting, but not including a vote to adjourn or to dissolve a town meeting, or a vote to appropriate a sum or sums of money for the payment of any bonds or notes of the town and interest on the same coming due, or a vote authorizing the borrowing of money in anticipation of taxes or other revenue of the town, or a vote declared by preamble to be an emergency measure necessary for the immediate preservation of the peace, health or safety of the town and adopted by a two thirds vote of the town meeting members, shall be operative until the expiration of ten days following the dissolution of the town meeting. If a petition of voters as provided in subsection (c), below [see note 5, *infra*], is not filed within said ten days all votes taken at the said town meeting shall then become effective."

ten days following the dissolution of the town meeting. See note 4, *supra*. If within the ten days a petition protesting a vote taken at the meeting, and certified by the board of registrars of voters to have been signed by not less than four percent of the voters, is filed with the board of selectmen, the challenged vote continues to be suspended, and the board of selectmen is required to order a special election for the submission of the question to all of the town's registered voters.[5]

To obtain the required certification of the board of registrars, § 2-15(c) provides, in part, that:

> "Not more than seven days following the dissolution of a town meeting any such petition shall be submitted to the board of registrars of voters which shall within three days following such referral determine whether the petition contains a sufficient number of valid signatures of voters. Said petition shall forthwith be referred by the registrars of voters to the board of selectmen."

The town's charter is carefully designed. Every final vote of the town meeting which is not beyond the reach of a referendum petition is suspended for ten days following the dissolution of the town meeting. Unless a referendum petition is filed with the selectmen within the ten-day period, each vote then becomes effective. The petition must bear the certifica-

---

[5] Section 2-15(c) provides, in part, as follows:

"*Petition* - If, within ten days following dissolution of a town meeting a petition which has been certified by the board of registrars of voters to have been signed by not less than four percent of the voters, as of the date of the most recent town election, is filed with the board of selectmen protesting the action of the town meeting in either approving or disapproving of a measure the vote under such warrant article shall be further suspended pending the outcome of the procedure as described below. All other votes taken at said town meeting against which no such petition has been presented shall then become final.

. . .

"The board of selectmen within seven days following receipt of notice that a petition contains a sufficient number of valid signatures shall order a special election to be held on a date fixed by it, not more than twenty-eight days after the date of its order, for the submission of such question, or questions, to the voters for a final determination."

Morway v. Webster.

tion of the board of registrars that it has been signed by not less than four percent of the voters. By requiring that the petition be submitted to the registrars by the end of the seventh day, the charter allows three days for the verification of signatures. But it is the filing of a certified petition with the selectmen that has the effect of suspending the challenged vote until the outcome of the vote at the special election which must then be called by the board of selectmen.

On January 12, 1988, the town held a meeting at which art. 19 on the town warrant was approved. That article authorized the board of selectmen to enter into a long-term lease of approximately six acres of town land to Vicon Recovery Systems of Webster, Inc. The purpose of the proposed lease was to permit Vicon to build and operate a facility for the disposal of municipal solid waste and to generate energy (steam or electricity, or both) in the process.

The plaintiffs, who had opposed the passage of art. 19, circulated a referendum petition to obtain the signatures required to have art. 19 placed on the ballot at a special referendum election. The parties have stipulated that the board of registrars have verified that the plaintiffs obtained the signatures of more than the required four percent of the registered voters in the town. That percentage translates to more than 1,000 signatures.

The parties have also stipulated that at 7:30 P.M. on January 19, 1988, the seventh day following the town meeting, the plaintiffs presented their referendum petition to the chairman of the board of selectmen, who, according to the stipulation, said he "accepted the petition and that he would send it over to the board of registrars." Finally, it is stipulated that the town clerk (who is also clerk of the board of registrars) was notified on January 20, 1988, that a referendum petition "was at the [s]electmen's office, [but] the [t]own [c]lerk refused to accept the petition [because] it was not filed within seven days of the dissolution of the [t]own [m]eeting as required by [s]ection 2-15 of the [c]harter."

There is no dispute that the plaintiffs did not follow the procedure prescribed by the town charter; at the close of the

seventh day their petition was delivered to the chairman of the board of selectmen and not to the clerk of the board of registrars.[6] The question to be decided is whether that deviation was fatal to the petition.

The plaintiffs suggest that delivery to the registrars was made on the seventh day because the chairman of the board of selectmen was acting for the board of registrars. There is no basis for that argument. A person cannot appoint himself the agent for another. See *Treasurer & Recr. Gen.* v. *Macdale Warehouse Co.,* 262 Mass. 588, 593 (1928). So, too, the plaintiffs' argument that the town should be estopped because of the conduct of the chairman must fail. See *O'Blenes* v. *Zoning Bd. of Appeals of Lynn,* 397 Mass. 555, 558 (1986) (court is reluctant to apply principles of estoppel to public entities); *Racette* v. *Zoning Bd. of Appeals of Gardner,* 27 Mass. App. Ct. 617, 620 (1989).

Much firmer ground is to be found by accepting the misstep and calling up the principle that not every error in exercising the right to local self-government guaranteed by art. 2 of the Amendments to the Constitution of Massachusetts, is beyond cure. Here, it is important to recall, more than one thousand voters — all that the charter requires — had signed a petition calling for a special election, and both the plaintiffs and the chairman acted in good faith and in the honest belief that there was compliance with the required procedure. In circumstances such as these, "[e]very rational intendment is to be made in favor of the rightful exercise of the franchise. That principle pervades and dominates all our decisions and harmonizes them all." *Swift* v. *Registrars of Voters of Quincy,* 281 Mass. 271, 277 (1932).

The court in *Swift* reviewed the Massachusetts decisions in which mistakes, irregularities and omissions in the political process were not fatal to the intended result. Included in the review was *Blackmer* v. *Hildreth,* 181 Mass. 29 (1902), where, said the *Swift* court, "a nomination paper for a candi-

---

[6]The town points out that the petition was not only given to the wrong person, but was given to him at approximately 7:30 P.M., "after business hours," on the seventh day.

date was filed two days later than the date when by the stat-
ute it 'shall be filed.' It was found that all the parties includ-
ing the town clerk and registrars acted in good faith in
receiving the nomination paper and printing the name of the
candidate on the official ballot. It was held that ballots pre-
pared must be counted notwithstanding the violation of the
legislative mandate expressed by 'shall.' " *Swift, supra* at
278-279. See *Myers* v. *Commonwealth*, 363 Mass. 843, 846
(1973) (the word "shall" as used in statutes may be con-
strued as permissive). Cf. *Hashimi* v. *Kalil*, 388 Mass. 607,
609 (1983).

More recently, and with considerably more illumination,
the Supreme Judicial Court considered the problem of proce-
dural errors against claims that the error, however innocu-
ous, was fatal. In *Schulte* v. *Director of the Div. of Employ-
ment Security*, 369 Mass. 74 (1975), Justice Kaplan
reviewed cases involving "[s]loppiness in following a pre-
scribed procedure for appeal" and found a "coherent ration-
ale." *Id.* at 79. Some cases, "on their face," call for the dis-
missal of the appeal, but in other cases, "the judge is to
consider how far . . . [the slip] interfered with the accom-
plishment of the purposes implicit in the statutory scheme
and to what extent the other side can justifiably claim
prejudice." *Id.* at 79-80.

While *Schulte* was concerned with errors in the litigation
process, its analytical framework is especially helpful to the
assessment of errors in the frequently tricky process of self-
government.

Some cases of procedural error in the political process
clearly call for dismissal — such as the addition of needed
signatures after the expiration of the statutory period follow-
ing the dissolution of a town meeting, as in *Gastown, Inc.* v.
*Registrars of Voters of Agawam*, 361 Mass. 876 (1972), or
the filing of a referendum petition beyond the prescribed pe-
riod following the passage of a protested vote, as in *Jackson*
v. *Registrars of Voters of Marlborough*, 353 Mass. 747
(1967). See also *Capezzuto* v. *State Ballot Law Commn.*,
407 Mass. 949 (1990), where the Supreme Judicial Court

found that an initiative petition which lacked proper subscription by at least ten qualified voters was invalid, although in the course of its opinion the court recognized "the proposition that 'exceedingly technical' arguments should not be permitted to block access to the ballot." *Id.* at 956.

In other cases, however, the result has turned on whether the error had the effect of significantly tainting the political process. Thus in *Massachusetts Teachers Assn. v. Secretary of the Commonwealth*, 384 Mass. 209 (1981), the court considered a variety of errors in the initiative process involving "Proposition 2." In assessing the importance of the error in the summary of the proposal, the court said that "the magnitude of the error in the summary may properly be measured by an analysis of the extent to which it was likely to have influenced voters." *Id.* at 235-236. Finding the error not to be significantly misleading, the court held that the summary was fair. *Id.* at 236. In *Gibbons v. State Ballot Law Commn.*, 387 Mass. 343 (1982), the court considered the importance of errors in the referendum petition involving the "Bottle Bill." There the error was the inclusion on the printed forms of the names of two persons who did not sign the petition and one who was improperly registered, contrary to constitutional requirements. The error was held harmless because it did not materially affect either the number of signatures obtained or the attitude of the persons who signed the forms. *Id.* at 350. See also *Hebert v. State Ballot Law Commn.*, 10 Mass. App. Ct. 275, 278-279 (1980).

Certainly the case at hand is not a case which, on its face, calls for dismissal. This might be true in a case where a certified petition has not been filed by the registrars with the selectmen prior to the expiration of the ten-day period during which the vote of the town meeting had been automatically suspended. Allowing late filing of the petition would in that situation create an intolerable gap in time during which third parties could reasonably rely on the presumed effectiveness of the vote. The *Jackson* case, 353 Mass. 747, presented just that problem.

Failure to comply with the seven-day period within which the petition must be submitted to the registrars is of a totally different order. The votes passed at the town meeting continue to be suspended for the entire ten-day period whether or not a referendum petition is submitted to the registrars by the end of the seventh day.[7] Late submission to the registrars will reduce the three days within which the registrars must verify signatures, but it does not create a time gap during which third-party reliance can occur. Any number of critical events can occur during the three-day period. The registrars could determine that the petition lacked the required number of signatures, see *Gibbons* v. *State Ballot Law Commn.*, 387 Mass. at 346, or that the number of valid signatures had been diminished below the required level. In either of these events, the petition would not "be referred" by the registrars to the selectmen, and the challenged vote would then become effective immediately following the ten-day period, but *not* before that date.

Late submission to the registrars, as we have said, may reduce the needed three-day period of examination of signatures, and it is on that account that late submissions may indeed prove to be fatal. But here the selectmen's call to the registrars on the morning of the eighth day did not reduce the three-day period, and it did not present a threat to the integrity of the referendum process.

On the special facts of this case — by which we mean the good faith delivery of the petition to the chairman on the evening of the seventh day, his acceptance of the petition in good faith and his undertaking to "send it over" to the registrars, and the call to the registrars the following morning — we conclude that no useful purpose intended by the charter would have been frustrated by the clerk's acceptance of the proffer of the petition by the selectmen on the morning of the eighth day. An "exceedingly technical" construction of the charter, *Capezzuto* v. *State Ballot Law Commn.*, 407 Mass. at 956, should not be adopted where the consequence is to

---

[7]The town's contrary contention is plainly wrong. See the last sentence of § 2-15(a), quoted in note 4, *supra.*

defeat the exercise of the franchise by more than one thousand voters of the town of Webster. See *Morris* v. *Registrars of Voters of E. Bridgewater*, 362 Mass. 48, 49-50 (1972) ("The voter is not to be disenfranchised because of minor irregularities").

Since the parties have agreed that all the signatures on the petition were valid, there should be a special election for submission of the question set forth in the referendum petition to the voters.

The judgment is reversed, and a new judgment shall be entered requiring the board of selectmen within twenty days of the entry of judgment after rescript to order a special election to be held on a date fixed by it, not more than twenty-eight days after the date of its order, for the submission of the referendum question to the voters for a final determination. See § 2-15(c), last par., note 5, *supra*.

*So ordered.*